We'll move now to the last case of the morning, United States v. Eatman. This is Appeal Number 18-2525. Thank you, Your Honor. May it please the Court, I'm Jamie Santos and I represent the District Court's denial of his motion to suppress. This Court has consistently said that the use of handcuffs generally signifies an arrest and that it is a rare case in which officers may use handcuffs without converting a Terry stop into an arrest. To constitute one of those rare cases, officers must point to specific reasons that they reasonably believed the use of handcuffs was necessary for safety or to prevent the suspect from fleeing. That high bar is not met here. Mr. Eatman was placed into handcuffs by officers who outnumbered him four to one before they had asked him a single question, even though he was not making any threats, he was not behaving erratically, he was not making any attempt to flee, and even though the officers had already neutralized any threat of a weapon by searching him and frisking him before they put handcuffs on him. If the use of handcuffs on this record is appropriate, then it's difficult to imagine any meaningful limitation on the use of handcuffs during a Terry stop. And it's undisputed that at the time the officers placed Mr. Eatman into handcuffs, they did not have probable cause to believe he had committed the act of unlawful weapons possession, which means that his arrest was unlawful and any subsequently obtained evidence should be excluded. Now, there are two issues before this Court essentially in this case. First, the Court must determine whether Mr. Eatman was under arrest at the time he was placed into handcuffs, and if the Court agrees with Mr. Eatman that he was under arrest at that time, the Court has to decide whether the fruits of that unlawful arrest, which includes Mr. Eatman's felon status, should be suppressed. Now I can start with the first issue. Mr. Eatman and the government seem to generally agree on the governing principles that the use of handcuffs during Terry stops should be rare, that officers have to point to compelling reasons why the use of handcuffs were necessary. In the United States v. Glenna, this Court referred to the standard as being that the use of handcuffs had to be the least intrusive means of safely effectuating a Terry stop. And based on those principles, this Court said the facts were a far cry from the facts before the Court here. And I think there were two cases we cite in our briefs that the Court said were close calls, so that's United States v. Glenna and Max v. Klotka, and both of those cases involved fairly extreme facts. In United States v. Glenna, officers had been informed that there was a suspected drug trafficker who was thought to have several small weapons and an explosive device with him in his vehicle. They encountered him at a gas station, and an officer believed he saw a weapon in the suspect's pocket. He immediately placed him into handcuffs so that he could safely search the man and his vehicle, which again was thought to have an explosive device. And this Court said that the issue was a close call, but in those kind of extenuating circumstances, the use of handcuffs was acceptable. Similarly, in Max v. Klotka, the case involved two officers who were outnumbered, and they were approaching on foot a vehicle with a suspected Latin Kings gang member who was thought to have committed two homicides and armed robbery. And the Court said again, you know, it's a close issue, but given that the two officers who were actively attempting to flee, the Court said that the use of handcuffs was appropriate. Why wouldn't the facts here justify a concern for safety, given the 9-1-1 call that was made where they said there was a gun, there was a domestic dispute, there were children involved, the security guard asked I think at least three times on that call if they could get there quickly because she was concerned about this situation. When they got there, he was, there's testimony, he was screaming and pounding on the door. When they approached him, he turned away like he was trying to hide something. And from the record, it seems that the use of the cuffs was fairly brief here. Why wouldn't that satisfy a concern for safety? Well, Your Honor, I think that you're right that the circumstances would give rise to a concern for safety. But that's why officers are allowed to frisk suspects during a Terry stop. But generally, they're not allowed to use handcuffs. And so I think that on these facts, even though there may be a generalized concern for safety, to go that further step and use handcuffs, which is, you know, the general indicator of an arrest, when you have someone who is not behaving erratically, who you've outnumbered, I don't believe that the safety concern rises to that level. But we have said that the line between an investigatory stop and an arrest, that the court considers the surrounding circumstances giving rise to a justifiable fear of personal safety on the part of the officer. So that question is directly relevant to the line between an investigatory stop and an arrest. Yes, Your Honor. And I do think the court has said, you know, there is a line. But the general rule is that handcuffs can't be used in your more typical Terry stop, where there's, you know, simply a general risk of a weapon or of safety. And I think if you look at the facts of this case, it demonstrates fairly conclusively that officers didn't believe that handcuffs were necessary to safely effectuate the stop, because the officers didn't use handcuffs until after they had already searched Mr. Eatman. So this case is unlike many of the cases where the officers used the handcuffs because someone is fleeing, behaving erratically, in order to do the search and determine whether there is a well-founded safety risk. What about Rabin, which is a civil case and a qualified immunity case, but it addressed the same question of use of handcuffs after an officer had secured the gun already. And they cuffed the defendant and they were entitled to qualified immunity there. Right. And I think that what the court did in Rabin, the court didn't say, you know, using handcuffs to determine whether someone has a permit is acceptable. They said that this doesn't meet the high bar for qualified immunity. It's not clearly established. And I know that your honors are all very familiar with how difficult that qualified immunity bar is to defeat. What I think is useful is both what Judge Robner said in her concurrence in Rabin, and also what this court has said in United States v. Leo, what Judge Hamilton said in United States v. Williams, which is that we are in a different time now, where after McDonald and after Heller, the possession of a firearm outside the home is not necessarily illegal. So officers, so prosecutors and judges are going to have to recalibrate what they do when they encounter a weapon while doing an investigative, a Terry stop, if you will. And so I think this is one of those examples, especially when you have a defendant who is not acting erratically and aggressively, and you have four people surrounding him alone in an empty hallway, I just don't think this could rise to a rare case. I think that would make the exception into the rule. How do you distinguish between acting erratically and screaming and pounding on the door and turning away when the officers arrive? Well, I think, your honor, I don't think you have to look much further than even the district court's decision in this case. On page one, it's A1 in the required short appendix, the district court said that Mr. Eatman, based on the officer's testimony, was behaving somewhat suspiciously. And I think if you look at the testimony of the officers, certainly they testified that he was in the hallway, he was pounding and saying, let me in, let me in. But it's very different from United States v. Vaccaro, where you had someone who was pulled over at a red light, was reaching and contorting his body in a way that looked like he was trying to grab a weapon as the officers were coming toward the car. Or Tom v. Voida, where a suspect was defying officers' orders to stop, continuing to flee, and the officer had to literally tackle him in order to stop him. I think that, you know, turning a body away and not behaving in a kind of erratic way in that would be similar to kind of any type of Terry stop. Does the record show how much time took place between the handcuffing and the time they asked him for the FOIA card that he couldn't respond to? So the record says that it happened in the same hallway. There's nothing in the record showing when he answered it, how he answered it, when officers would have determined that he didn't have a FOIA card. And I think that's one of the challenges of this case. There just isn't a record that would demonstrate what would have happened if they hadn't handcuffed him. And again, the standard... Well, that's not the standard. You don't look at what would have happened if they hadn't done it. Is there anything in the record that shows how long they were in that hallway? I think that what we know is that the 9-1-1 was called at about 5-0-9. I think there's a stipulation that the weapon was taken at 5-16. But after that, there's no indication from the record. And I see that I'm almost out of my time, so thank you. You reserve the remainder. Thank you. Thank you. We'll next hear from Mr. Choi on behalf of the government. Good morning. May it please the court, Chester Choi on behalf of the United States. The district court properly denied the defendant's motion to suppress. The only thing that the defendant challenges on appeal is the police's discovery of his status as a felon. He concedes that the police conducted a valetary stop and lawfully seized his firearm. The police discovered the defendant's status as a felon after conducting a lawful arrest in which they had probable cause to do so. At the time that the defendant's arrest, when officers placed him in the elevator and let him down to the squad car... So you're not saying he was arrested when he was cuffed? No, he was not. He was arrested as they put him in the elevator and put him into the patrol car. And from your standpoint, is there anything in the record that would tell us how long passed between the time they cuffed him and the time they arrested him in the elevator? There's nothing in the record that says precisely how many minutes passed after he was placed in handcuffs and when they asked him about the FOIA card. What's in the record is that they did ask him that question before they reached the elevator. And it's also in the drafted at the time of the arrest, which stated that the defendant could not produce the FOIA or the concealed carry permit. But nothing about timing? Nothing about timing. But it was... The question was asked while he was still in the hallway. So at the time of the defendant's arrest, the officers had probable cause to arrest the defendant on violations of state law. First, the district court found that officers... And I'm sorry to interrupt, but at the time of his arrest or at the time of the handcuffing? At the time of the arrest. First, the district court found that the officers arguably had probable cause to arrest the defendant for disturbing the peace and the domestic incident. Although the defendant argues that this was not the district court's primary basis for the arrest, and this is, the defendant, armed with a loaded firearm, was pounding on the door of his girlfriend's apartment trying to get in an apartment hallway at 5 a.m. in the morning. By definition, this is disturbing the peace. It is also a potential violation of Illinois' domestic violence statute, which prohibits conduct that causes emotional distress to another. In addition, and at the time that the defendant was placed under the arrest, the officers knew that the defendant did not have a FOID and did not have a concealed carry, making his arrest for unlawful use of a weapon lawful. In any event, it does not make sense to suppress the defendant's status as a felon here for the same reason that identity is not suppressible. A person's criminal history is part of his identity. It's something that they can access as a part of their law enforcement duties, and they can access the criminal history without violating the Fourth Amendment. In that way, it's no different from information about immigration status, which was dealt with in Lopez-Mendoza and Chagoya-Morales. Immigration status is not suppressible because the police could just re-arrest the individual. The same is true here. Absent of the arrest, the officers could have verified the defendant's criminal history by searching a law enforcement database, and then gone back and arrested him. It would be no different. Therefore, the deterrent's benefit of suppressing the defendant's felon status is low, and this is simply not information that should be suppressible. A similar but distinct argument is that suppression of the defendant's felon status would be a completely disproportionate remedy to the alleged violation here. We're talking about a period of mere minutes in which the defendant was in handcuffs before the officer. How do we know that? How do we know it was mere minutes? We can infer that based on the fact that the question was asked in the hallway, and that they were able to... Is there anything in the record about how long they were in the hallway? The only way that tells you that that's relevant or could give you some insight into it is if we know when they arrived at the hallway, when they left the hallway, or we have some sense from the record of how long they were in the hallway. Yes, Your Honor. It was stipulated that the gun was seized at approximately 5.16, and I believe from the arrest report, the arrest happened around 5.30, so the period in which they were in the hallway could not have been very long. Given that timeframe, when we look at the alleged violation compared to the amount of time he was in handcuffs before they were able to confirm that he did not have a FOID or a concealed carry, suppression is just simply not the right approach here, and it would be a disproportionate remedy. How do you respond to the argument that the use of the cuffs after they found the firearm on Mr. Eatman converted this Terry stop to an arrest? The use of handcuffs did not automatically turn the valid Terry stop into an arrest. Handcuffs lawfully may be used on a suspect during a Terry stop without placing the suspect under arrest where handcuffs are reasonably necessary for the protection of the officers and others at the scene. And here, the use of handcuffs was reasonably necessary. The officers were responding to a 9-1-1 domestic violence call. Generally, these situations are highly emotional. They're tense. They're unpredictable, especially when a weapon is involved. Let's talk about the domestic violence component. As I understand the record, the security guard is the one who calls. In this security guard's call, he makes mention of a weapon, correct? Yes, it's in the 9-1-1 call, and it's also when the officers arrive on the scene and they talk to the security guard. The security guard tells the officers that the offender may have a weapon. And the domestic aspect of this, the fact that Mr. Eatman is attempting to get into the apartment, that domestic aspect, does that come from the security guard, or how does the domestic aspect inject itself into the factual circumstances? Well, that was what was described in the 9-1-1 call, that there was the offender that was beating up his girlfriend, and that they asked for the officers to come to the scene. And that was corroborated by what they heard from the security guard before they went up. But did they say on the 9-1-1 call that the offender was beating up his girlfriend? I thought the security guard on the 9-1-1 call just said there was a domestic in the apartment. It was either in the 9-1-1 call or in the dispatch. But that is information that the officers had prior to going up in the hallway. Well, those are two different things, though, that if he's beating up the suspect, that's one aspect. If it's just that it's a domestic, that could be a lot of different things. So, the security guard, they did learn it from the security guard that there was the offender that was involved in a domestic battery against a female living in apartment 1903. So that is information that they had as they went up to the 19th floor. They get up on the 19th floor. They see the defendant pounding on the door and screaming. As they approach the defendant, the testimony is that he was acting nervous and he started pounding the door even faster. They had to tell the defendant twice to step away from the door and twice to put his hands up on the wall so that they could conduct a pat-down. They find a loaded weapon on his waistband. And at this point, even after they handcuffed him, after the argument, which just shows that the situation had not de-escalated and that the use of handcuffs here was reasonably necessary to secure the safety of the officers and the people in the apartment. There are no further questions, Your Honor. Thank you, Mr. Choi. Ms. Santos, we'll give you another minute for rebuttal. Thank you, Your Honor. I'd like to just try to make three brief points. The first point Excuse me a minute. Yes, Your Honor. Is the fact that there were four officers there important? Yes, Your Honor. Why is it important? Because in several cases, this Court has mentioned that being outnumbered is a factor that might warrant Outnumbered if the fight has already been decided. So, if the four men have any advantage, if he's got the gun or he is, even if they got a suit, and he's battered in hell, do you have to wait until he attacks one of them before you can put the cuffs in? Well, no, Your Honor. But we know here that the officers did not put the cuffs on him until after they had already searched him. Well, I understand that. But he was not acting rationally. Do they have to wait until one of them puts the cuffs in? No, Your Honor. But what officers do have to do is use judgment in assessing the situation. And they did use judgment. You just don't approve of it. Well, Your Honor, I think that this Court has on several occasions cautioned officers against using handcuffs simply because they're conducting a Terry stop, even though there may be a weapon. And that's when, that's why you're allowed to frisk. The courts have done it, but I mean, it's an abstract question to us. It's a concrete question to the police officers. Taking over for some guy who's screaming and yelling at you irrationally. Well, Your Honor, I think that if he had, if the record showed that he had exhibited, you know, aggressive actions towards the officers, the officers all said that he wasn't making threats, he wasn't trying to flee, he wasn't, you know, reaching for, he wasn't doing any of that was not distinguishable from many Terry stops. Go ahead. I didn't mean to. I'm sorry, Your Honor. May I? You may conclude. Yes, ma'am. Thank you, Your Honor. Three brief points. The first point is that, Judge Sinead, you've asked several times about how much time was in between the handcuffing and the question. And I think the key fact here is that the probable cause is measured at the moment the officers arrest someone. And sometimes that benefits the government. Sometimes it benefits the defendant. But that's the rule, whether it's five seconds, five minutes, or five hours afterwards. The second point is that my friend, Mr. Choi, has mentioned that these records were in the government's possession already. There is no government records exception to the exclusionary rule. Even this court didn't go that far in Chagoya-Morales. What the court said in Chagoya-Morales is that immigration status is not, should not be suppressed because if someone is illegally present in the United States after deportation, then if they're released, they can just be arrested tomorrow for the same crime. And there's actually some support from that in Lopez-Mendoza, where the court said the constable's error may allow a criminal to go free. But we have never said that the criminal can continue the condition of ongoing illegal conduct. So criminal history and that immigration status is very different. And no court has ever extended that principle beyond the Section 1326 context. Thank you, Your Honors. Thank you, Ms. Santos. Ms. Santos, you and your firm were appointed in this case? Yes, Your Honor. You have the great thanks of the court. Thank you. Thank you. Thank you to Ms. Santos. Thank you, Mr. Choi, the case will be taken under advisement. Our sixth case for the morning has been taken under submission on the briefs. So that will complete our hearings this morning. Thank you. Thank you.